1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 12/17/08**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

KNOWLEDGEPLEX., INC,

　　　　　　　　　Plaintiff,

　　v.

PLACEBASE, INC., a/k/a METONYMY, INC.

　　　　　　　　　Defendants.

Case Number C 08-4267 JF (RS)

**ORDER[1] DENYING MOTION TO DISMISS**

Plaintiff KnowledgePlex, Inc. ("Plaintiff") alleges that Defendant Placebase ("Defendant") breached a contract, misappropriated trade secrets, and infringed certain copyrights by using Plaintiff's proprietary computer code for a web-based geospatial database to build its own rival system.  Plaintiff characterizes its source code, called DataPlace, as "the preeminent national geospatial data information system for the affordable housing community," enabling users to gather housing, demographic, and other community data for specific geographic areas they select.  Plaintiff alleges that the DataPlace project was an undertaking of

---

[1] This disposition is not designated for publication in the official reports.

1   unprecedented complexity and sophistication in its field.  Defendant was engaged as a

2   subcontractor in developing DataPlace, and allegedly was paid $3.4 million over the course of

3   three years for its role in the development process.  When Defendant produced and began

4   marketing what Plaintiff alleges is a "virtually identical system" that Defendant developed in

5   considerably less time and with considerably fewer resources, Plaintiff "investigated" the matter,

6   determined that Defendant had misused the proprietary DataPlace code in creating its rival

7   system, and filed suit.

8                                   **I. BACKGROUND**

9           In 2000, the Fannie Mae Foundation launched the KnowledgePlex initiative ("KPI")[2] to

10  support practitioners and activists involved in promoting affordable housing and community

11  development.  Among other activities, KPI allegedly gathered and distributed news and research

12  tools to support efforts to transform disadvantaged communities and neighborhoods.  To meet the

13  needs of the affordable housing community more effectively, KPI allegedly began developing a

14  national data-sharing system with the goal of allowing users to access and manipulate large

15  quantities of geographic and demographic data relevant to affordable housing.  In 2004, KPI

16  requested proposals for the development of the required software, which ultimately became

17  DataPlace.

18          Given the unprecedented nature of the undertaking and the correspondingly large

19  investment of time and money required, KPI sought to ensure that it would have complete

20  ownership rights to the resulting computer code.  The request for proposals included the

21  following notice:

22          1.4 IMPORTANT NOTICES
            1.4.1 Ownership. All work produced or created by the successful bidder, including
23          but not limited to, the designing, developing, implementing, and maintaining of
            the [community data system], whether individually by the successful bidder (or its
24          employees, agents, or subcontractors), or by [KPI], or jointly, shall belong solely
            and exclusively to [KPI], which will possess all ownership rights in and to such
25          work and any intellectual property rights associated therewith . . .

26  ─────────────────────

27      [2] Plaintiff alleges that in 2004, the Fannie Mae Foundation transformed the
    KnowledgePlex initiative into KnowledgePlex, Inc.  Plaintiff claims to be the successor-in-
28  interest of the Fannie Mae Foundation.  Complaint ¶ 8.

                                            2

1   In response, a developer known as Vinq, LLC submitted a proposal.  Vinq identified Defendant

2   as its subcontractor and allegedly agreed to assign the rights to all resulting intellectual property

3   to KPI.  Plaintiff alleges that Defendant never had "created a national mapping program of the

4   scale and scope KPI envisioned," and that Defendant's existing technologies "could serve neither

5   as a shortcut or even a starting point for development" of DataPlace, principally because of their

6   limited geographical scope and inability to handle high volumes of user traffic.  Pl.'s Opp. at 4:6-

7   13.

8       In July 2004, KPI and Vinq executed a contract for the DataPlace work (the "Prime

9   Contract").  The Prime Contract required that all work on the project, whether produced by

10  KPI, Vinq, or a subcontractor, be owned by KPI:

11          Exclusive Property Rights of [KPI]. All work produced or created pursuant to this
            Agreement, whether individually by Contractor (or its employees, agents, or
12          subcontractors), or by [KPI], or jointly ("Work"), shall belong solely and
            exclusively to [KPI], which will possess all ownership rights in and to such Work
13          and any Intellectual Property Rights associated therewith, including without
            limitation, patent, trademark, copyright and trade secret rights. . . .

14  Prime Contract, Moorhead Decl., Ex. 1A, § 6(a).  The Prime Contract also assigned all rights in

15  the work to KPI, *id*. § 6(c), and denied Vinq the right to use the intellectual property created

16  under the contract, *id*. § 6(e).  The Prime Contract required that each deliverable furnished as part

17  of the project be originally developed for KPI and not be derived from any preexisting

18  proprietary material:

19          Originality. Except for Third Party Code incorporated into the Work described in Section
            6(f) above, each deliverable furnished by Contractor hereunder shall be originally
20          developed for [KPI] and shall not be derived from any copyrighted or proprietary
            material, or otherwise subject to or infringing upon, any proprietary interest or work of
21          any third party.

22  Prime Contract, §8(c).

23      After the Prime Contract was executed, Defendant executed a subcontract with Vinq (the

24  "Subcontract").  Defendant agreed to be bound by the "applicable provisions" of the Prime

25  Contract.  The Subcontract stated:

26          The Prime Contract. This Agreement is subject to those terms of the Prime
            Contract, attached hereto as Exhibit A, applicable to [Placebase] or the Services
27          (as defined below), which terms are incorporated by reference as if fully set forth
            herein.  All applicable provisions contained in the Prime Contract shall be binding

28

3

upon [Placebase], and [Placebase] hereby agrees to comply with such provisions [in] the Prime Contract.

Subcontract, Moorhead Decl., Ex. 1, § 2.  The Subcontract required that any deliverables produced by Defendant would be owned exclusively by KPI:

> Exclusive Property Rights of [KPI]. All Deliverables produced or created pursuant to this Agreement, whether individually or by [Placebase] (or its employees, agents, or its permitted subcontractors), or jointly with one or both of [KPI] or Vinq ("Work"), shall belong solely and exclusively to [KPI], which will possess all ownership rights in and to such Work and any intellectual property rights associated therewith, including without limitation, patent, trademark, copyright and trade secret rights.  [Placebase] agrees that it shall include and enforce such provisions in all permitted subcontracts to ensure the exclusivity of [KPI's] ownership as set forth herein. [KPI], its successors, and assigns, shall have the right to obtain and to hold in its own name all patents, copyrights, registrations, and such other intellectual property rights and protection as may be appropriate.

Subcontract, § 14(b). The Subcontract also required that Defendant's work be developed originally for the DataPlace project. Thus:

> [Placebase's] Intellectual Property Warranties. Except to the extent of any Preexisting Technology of Vinq or [KPI] that may be incorporated into a Deliverable, [Placebase] warrants that each Deliverable has been originally developed for Vinq and [KPI] and was not derived from any copyrighted or property [sic] material of any third party. [Placebase] warrants that it has all intellectual property rights necessary to perform the Services and develop and license the Deliverables as provided in this Agreement. [Placebase] warrants that, to [Placebase's] knowledge, the Deliverables will not violate the intellectual property rights of any third party, including trademark, patent, copyright, and trade secrets, or proprietary and non-disclosure rights.

Subcontract, § 15(b).  Defendant agreed further that

> all Work produced [under the Subcontract] shall be works made for hire under the U.S. copyright laws. In addition, [Placebase] hereby irrevocably transfers, conveys, and assigns in perpetuity to [KPI], its successors, and assigns, any and all rights, title, and interest which [Placebase] may have in or to Work, including, without limitation, rights under copyright, patent and trademark law.

Subcontract, §14(c).  In addition, the Subcontract barred Defendant from any future use of that work:

> No License. Except as necessary for [Placebase's] performance of this Agreement, no license to [Placebase] under any trademark, patent or copyright, or other intellectual property right which is now or may hereafter be owned by Vinq or [KPI] is either granted or implied by this Agreement.

Subcontract, § 14(e). Finally, the Subcontract contained confidentiality requirements, barring Defendant from using any other work in developing DataPlace or from using any

1    of the proprietary work or information associated with DataPlace in any other system or

2    project.  Subcontract, § 13.

3        The development of DataPlace spanned several years, during which time the DataPlace

4    programmers allegedly encountered and solved numerous technical challenges unique to the

5    complex, large-scale undertaking that the DataPlace project entailed.  Once the project was

6    largely complete and available to users online, Plaintiff allegedly sought to engage Defendant as

7    a prime contractor to continue the work.  Plaintiff claims to have offered merely to substitute

8    Defendant's name for Vinq's, but Defendant allegedly refused to agree to the intellectual

9    property provisions of the contract.

10       Plaintiff states that it became concerned that Defendant, using the proprietary DataPlace

11   code, had "transformed its Pushpin product to include every caching and scaling innovation of

12   DataPlace," including tiling of maps and generating thematic, point, and cartographic data.  Pl.'s

13   Opp. at 10:24-27.  Plaintiff alleges that "[m]ost of those features were created through the

14   intensive effort led and funded by KPI and of which Placebase was a part.  While Placebase had

15   never developed a national mapping system before the more than three-year, 50,000-hour

16   DataPlace project, it developed PolicyMap in less time using significantly fewer resources."

17   Pl.'s Opp. at 11:18-19 (citing Complaint ¶¶ 33-34).  Based on this functional similarity,

18   Defendant's access to the DataPlace code, and the alleged impossibility of developing a rival

19   system in so little time and with so many fewer resources, Plaintiff concluded that Defendant

20   improperly had used the DataPlace code.

21       Defendant initially filed suit in the United States District Court for the District of

22   Columbia, which dismissed the action based on a forum selection clause requiring that any

23   litigation proceed in Santa Clara County, California.  Plaintiff then filed the instant action on

24   September 10, 2008.[3]  Defendant now moves to dismiss the complaint under Federal Rules of

25

26       [3] On September 19, 2008, Plaintiff sent Defendant's internet service provider a DMCA
     takedown notice based on the same copyright infringement allegations that give rise in part to
27   this lawsuit.  Defendant applied for a temporary restraining order, which this Court granted on
     September 26, 2008.  Defendant subsequently moved for preliminary injunctive relief identical in
28   scope to that afforded by the TRO.  Upon receiving assurances from Plaintiff's counsel in open

1   Civil Procedure 12(b)(7), 12(b)(6), and 12(b)(1).  For the reasons set forth below, the motion will

2   be denied.

3                                        **II. DISCUSSION**

4          Defendant urges dismissal of the instant action on several grounds.  First, Defendant

5   contends that Vinq is a necessary party, requiring dismissal pursuant to Rule 12(b)(7) for failure

6   to join a necessary party, as required by Rule 19(a).  Second, Defendant argues that Plaintiff has

7   failed to state a cognizable claim for breach of contract or trade secret misappropriation,

8   requiring dismissal of those claims pursuant to Rule 12(b)(6).  Finally, Defendant argues that the

9   Court must dismiss Plaintiff's copyright infringement claim because the deposits underlying the

10  allegedly infringed copyrights are defective, depriving the Court of subject matter jurisdiction.

11  The Court addresses each of these arguments in turn.

12  **A.     Dismissal pursuant to Rule 12(b)(7)**

13         Rule 12(b)(7) permits dismissal of an action where a necessary and indispensable party

14  has not been joined pursuant to Rule 19(a).  The two inquiries relevant to the application of Rule

15  19(a) in the instant case are (1) whether the absent party is "necessary,"and (2) if so, "whether it

16  is feasible to order that the absentee be joined."  *See Wilbur v. Locke*, 423 F.3d 1101, 1111-1112

17  (9th Cir. 2005) (quotation marks and citation omitted).  When an absent party can be joined to

18  the case, "the court must order that the person be made a party," and may not order dismissal.

19  Fed. R. Civ. P. 19(a)(2).  As Plaintiff notes, Vinq has consented to jurisdiction in this Court and

20  could be joined if necessary.  Thus, dismissal pursuant to Rule 12(b)(7) would be inappropriate at

21  this juncture.  The only question is whether Vinq is a necessary party.

22         Rule 19(a) provides that a party must be joined if

23         (A) in that person's absence, the court cannot accord complete relief among
           existing parties; or (B) that person claims an interest relating to the subject of the
24         action and is so situated that disposing of the action in the person's absence may:
           (i) as a practical matter impair or impede the person's ability to protect the
25         interest; or (ii) leave an existing party subject to a substantial risk of incurring
           double, multiple, or otherwise inconsistent obligations because of the interest.
26

27  _____

28  court that no further takedown notices would be sent to any person in connection with the subject
    of this lawsuit, the Court denied the motion for a preliminary injunction as moot.

                                                6

1  Fed. R. Civ. P. 19(a).  Courts frequently have concluded that parties to a contract are "necessary"

2  in an action on the contract.  *See, e.g.*, *Wilbur*, 423 F.3d at 1113; *Lomayaktewa v. Hathaway*, 520

3  F.2d 1324, 1325 (9th Cir. 1975).  While this principle applies with particular potency in actions

4  to void a contract, *see, e.g.*, *Wilbur*, 423 F.3d at 1113; *Makah Indian Tribe v. Verity*, 910 F.2d

5  555, 558 (9th Cir. 1990); *Lomayaktewa*, 520 F.2d at 1325, it is no less relevant in actions to

6  determine rights and obligations under such a contract.  Thus, even if a party does not, through

7  his absence, risk losing all rights under a contract, that party's "attempts to protect its interest

8  nevertheless may be *practically* impaired or impeded by proceeding with [the] action in its

9  absence."  *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701,

10  708 (S.D.N.Y. 1997).  This is true whenever the absent party "has clear rights and affirmative

11  obligations under the contract which [the court] must construe."  *Ente Nazionale Idrocarburi v.*

12  *Prudential Secs. Group, Inc.*, 744 F. Supp. 450, 458 (S.D.N.Y. 1990).

13      The Court agrees with Defendant (1) that Vinq's rights as a practical matter could be

14  impaired by a disposition of this action in its absence, and (2) that Defendant could be subjected

15  to multiple and inconsistent obligations as a result of Vinq's absence.  Vinq is a party to both the

16  Prime Contract and the Subcontract that form the basis of Plaintiff's claims, and any

17  interpretation of those agreements as a practical matter may impair Vinq's rights or obligations.

18  For example, Plaintiff's allegations stem in part from obligations contained in the Prime Contract

19  between Vinq and Plaintiff, which required Vinq to ensure that all subcontractors were bound by

20  the terms of the Prime Contract.  If Plaintiff is forced to argue that Vinq should have discharged

21  that contractual obligation differently, Vinq's rights and obligations will be litigated in the instant

22  action.  While this Court's judgment would not bind Vinq as an absent party, it might well affect

23  Vinq's rights and business reputation.

24      With respect to Defendant's interests, it is apparent that litigation in Vinq's absence could

25  subject Defendant to multiple and inconsistent judgments.  If Plaintiff does not succeed in this

26  action because Vinq failed properly to bind Defendant to the terms of the Prime Contract,

27  Plaintiff ultimately might sue Vinq for breaching the terms of the Prime Contract.  Vinq in turn

28  might sue Defendant, alleging that Defendant, not Vinq, breached its duties under the contract.

1    Because Vinq would not be bound by this Court's judgment, Defendant might face another

2    action arising from the instant dispute.  In light of the foregoing, the Court finds that Vinq is a

3    necessary party for purposes of Rule 19(a) and will order that it be joined to this action.

4    **B.    Dismissal of breach of contract and trade secret misappropriation claims pursuant**

5    **to Rule 12(b)(6)**

6         Plaintiff claims that it is a third-party beneficiary of the Subcontract executed between

7    Defendant in Vinq, which allegedly incorporated key confidentiality and exclusivity-of-

8    ownership provisions contained in the Prime Contract executed between Vinq and Plaintiff.

9    Defendant argues that Plaintiff cannot have been a third-party beneficiary of the Subcontract

10   because certain "contradictory" provisions in that contract benefit Defendant.  With respect to its

11   claim for trade secret misappropriation, Plaintiff alleges that the confidential source code

12   developed for the DataPlace project is a trade secret, and that Defendant "us[ed], cop[ied], and

13   misappropriat[ed]" it.  Defendant argues that Plaintiff has failed adequately to identify what

14   particular material constitutes a trade secret or to allege that Defendant was bound by any

15   confidentiality agreement not to use the material.

16        **1. Legal standard**

17        A complaint may be dismissed for failure to state a claim upon which relief may be

18   granted for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts

19   under a cognizable legal theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34

20   (9th Cir. 1984).  For purposes of a motion to dismiss, all allegations of material fact in the

21   complaint are taken as true and construed in the light most favorable to the nonmoving party.

22   *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994).   A complaint should not be

23   dismissed "unless it appears beyond doubt the plaintiff can prove no set of facts in support of his

24   claim that would entitle him to relief."  *Clegg*, 18 F.3d at 754.  However, a plaintiff is required to

25   provide "more than labels and conclusions," *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S.Ct.

26   1955, 1964 (2007), and the "[f]actual allegations must be enough to raise a right to relief above

27   the speculative level."  *Id*. at 1965.

28

                                          8

1

### 2. Breach of contract claim

2    To state a claim for breach of contract, a plaintiff must plead the following four elements:

3 (1) the existence of a contract; (2) performance by the plaintiff or excuse for nonperformance; (3)

4 breach by the defendant; and (4) damages. *Santana Row Hotel Partners, L.P. v. Zurich Am. Ins.*

5 *Co.*, 446 F. Supp. 2d 1108, 1114 (N.D. Cal. 2006). A third-party beneficiary may enforce a

6 contract made "expressly" for his or her benefit. Cal. Civ. Code § 1559; *Kaiser Eng'rs, Inc. v.*

7 *Grinnell Fire Prot. Sys. Co.*, 173 Cal. App. 3d 1050, 1055 (1985). "The term 'expressly' in Civil

8 Code section 1559 . . . mean[s] merely the negative of 'incidentally.'" *Id*. (citation omitted).

9 Thus, while the "the intent of the contracting parties to benefit expressly that third party must

10 appear from the terms of the contract," *id*., "it is not necessary that the beneficiary be named and

11 identified as an individual; a third party may enforce a contract if he can show he is a member of

12 a class for whose benefit it was made," *Prouty v. Gores Tech. Group*, 121 Cal. App. 4th 1225,

13 1233 (2004). A third party also need not be the exclusive beneficiary of each term of a contract

14 in order to enforce those terms that do benefit it. *See Embry v. King*, 191 F. Supp. 2d 1071,

15 1086-87. As long as "the terms of the contract necessarily require the promisor to confer a

16 benefit on a third person, then the contract, and hence the parties thereto, contemplate a benefit to

17 the third person." *Prouty*, 121 Cal. App. 4th at 1233.

18    Plaintiff's complaint alleges the following with respect to Defendant's obligations under

19 the Prime Contract and Subcontract: (1) Plaintiff and Vinq entered the Prime Contract, which

20 required (a) that the software developed by Vinq for Plaintiff be original, (b) that Vinq treat

21 Plaintiff's confidential and proprietary information as confidential, and (c) that Plaintiff receive

22 ownership of all rights in the system, Complaint ¶ 15; (2) the Subcontract between Defendant

23 and Vinq "incorporated the applicable provisions of the Prime Contract, which was attached to

24 the subcontract," *id*. ¶ 16; (3) Defendant (a) agreed in the Subcontract that all work produced as

25 part of the project would be originally developed for and owned by Plaintiff, (b) agreed to assign

26 its rights to such material to Plaintiff, and (c) "agreed to be bound by strict confidentiality

27 obligations during and after the project," *id*. ¶ 17; and (4) Plaintiff is a third-party beneficiary of

28 the relevant provisions of the Subcontract between Defendant and Vinq.

9

1    Given the generous pleading standard of Rule 8(a), which requires only a short and plain

2  statement showing the complainant's entitlement to relief, *see Erickson v. Pardus*, __ U.S. __,

3  127 S.Ct. 2197, 2200 (2007) (noting that "[s]pecific facts are not necessary; the [short and plain]

4  statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon

5  which it rests" (citation omitted)), Plaintiff more than adequately has alleged the existence of a

6  contract and its status as a third-party beneficiary of the relevant provisions.  Defendant argues

7  that Plaintiff is not an intended beneficiary of key confidentiality and ownership provisions in the

8  Subcontract–the sole purpose of which was to facilitate a large-scale software development

9  project intended exclusively for Plaintiff's benefit–because of certain provisions that benefit

10  Defendant as well.  Defendant refers principally to § 14 of the Subcontract, which states that

11  "[e]ach party is and shall remain the sole and exclusive owner of all right, title, and interest in

12  and to its own Preexisting Technology and associated intellectual property rights."  Subcontract,

13  § 14(a).  Defendant states that, "[p]er the subcontract, [it] retained its rights to its own existing

14  technology, which includes, at least, the code now underlying Pushpin."  Def.'s MTD at 6:15-18.

15    Not only does this assertion beg the ultimate question of whether Defendant's code *is*

16  solely a preexisting work or a derivation[4] thereof, but it is far from clear how this provision could

17  be read to vitiate the many confidentiality and exclusivity provisions contained both directly in

18  the Subcontract and incorporated therein by reference to the Prime Contract.  Even setting aside

19  the scope and operation of the incorporation clause, §§ 14(b)-(e) & § 15(b) of the Subcontract

20  appear to confer upon Plaintiff the contractual rights it requires to state a claim for breach of

21  contract, and Plaintiff unquestionably is a third-party beneficiary of these provisions.  Each

22  provision makes explicit that the beneficiary is the "End Client," which the Subcontract defines

23  as the Fannie Mae Foundation–Plaintiff's alleged predecessor-in-interest.  *See, e.g.*, *Christian v.*

24

25    [4] Section 14 of the Subcontract also protects Defendant's rights to works that are
   "derivative" of its preexisting materials.  "A 'derivative work' is a work based upon one or more

26  preexisting works, such as a translation, musical arrangement . . . art reproduction, abridgement,
   condensation, or any other form in which a work may be recast, transformed, or adapted.  A work

27  consisting of editorial revisions, annotations, elaborations, or other modifications which, as a
   whole, represent an original work of authorship, is a 'derivative work.'"  *Jarvis v. K2 Inc.*, 486

28  F.3d 526, 531 (9th Cir. 2007).

10

1   *Flora*, 164 Cal. App. 4th 539, 553 (2008) ("[P]laintiffs are in effect third party beneficiaries of

2   the actions taken by the defendants' predecessors in interest.").  At a minimum, the operation of

3   the clause cited by Defendant in §14(a) of the Subcontract is not an appropriate basis for granting

4   the instant motion to dismiss.

5          Defendant also argues that Plaintiff has provided no more than mere "labels and

6   conclusions" with respect to the nature of the alleged breach.  The complaint, however, explains

7   in considerable detail the elaborate and allegedly unprecedented nature of the DataPlace

8   undertaking, the involvement in that project of the same software engineers who ultimately

9   developed Defendant's allegedly infringing code, and the apparent impossibility of producing a

10  product comparable to Plaintiff's in the brief period in which Defendant allegedly did so.

11  Drawing all reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff has

12  provided Defendant with notice of the claim sufficient to satisfy Rule 8(a).

13         **3. Trade secret misappropriation claim**

14         Plaintiff alleges that Defendant misappropriated trade secrets in violation of the

15  California Uniform Trade Secrets Act ("UTSA"), Cal. Civ. Code § 3426.  To state a claim for

16  misappropriation of trade secrets, Plaintiff must show (1) the existence of a trade secret, and (2)

17  the misappropriation of that trade secret.  The UTSA defines a "trade secret" as "information,

18  including a formula, pattern, compilation, program, device, method, technique, or process, that:

19  (1) derives independent economic value, actual or potential, from not being generally known to

20  the public or to other persons who can obtain economic value from its disclosure or use; and (2)

21  is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Cal.

22  Civ. Code § 3426.1(d).  Misappropriation is defined as either "(1) acquisition of a trade secret of

23  another by a person who knows or has reason to know that the trade secret was acquired by

24  improper means; or (2) disclosure or use of a trade secret of another without express or implied

25  consent by a person who" used improper means to acquire knowledge of the trade secret or knew

26  that such knowledge was improper."  Cal. Civ. Code § 3426.1(b).

27         Defendant contends that Plaintiff has neither alleged the existence of a trade secret with

28  sufficient particularity nor alleged that such a trade secret had "independent economic value,

1    actual or potential, from not being generally known." *See* Cal. Civ. Code § 3426.1(d).  A

2    complaint "should describe the subject matter of the trade secret with sufficient particularity to

3    separate it from matters of general knowledge in the trade or special knowledge of those persons

4    who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries

5    within which the secret lies." *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968).

6    However, "one who seeks to protect his trade secrets from wrongful use or disclosure does not

7    have to spell out the details for the trade secret to avoid a demurrer to a complaint." *Premiere*

8    *Innovations, Inc. v. Iwas Indus., LLC*, No. 07cv1083, 2007 WL 2873442, at *4 (S.D. Cal. Sep.

9    28, 2007).

10       The complaint states that "[t]he code required to operate DataPlace and all of the design

11   and development work of the project to create the code are protectable trade secrets of

12   KnowledgePlex because they have independent value from being confidential and not readily

13   known or ascertainable by proper means, and because they are the subject of reasonable efforts to

14   maintain their secrecy."  Complaint ¶ 51.  Defendant contends that this allegation is an

15   impermissible "legal conclusion couched as a factual allegation."  *Bell Atlantic Corp. v.*

16   *Twombly*, __ U.S. __, 127 S.Ct. 1955, 1965 (2007).  Defendant, however, ignores several

17   specific portions of the complaint alleging that Placebase was subject to confidentiality

18   requirements governing the entire DataPlace project (even if only through the Subcontract's

19   incorporation clause), and that the development team worked "confidentially . . . behind firewalls

20   on secure servers through secure channels with limited, restricted access."  Complaint ¶¶ 15, 21.

21   Moreover, Plaintiff's allegations regarding the groundbreaking nature of the DataPlace

22   undertaking, its potentially broad application, and the confidential manner in which the work

23   proceeded indicate value for purposes of Cal. Civ. Code § 3426.1(d).  Accordingly, Plaintiff's

24   allegation of a valuable trade secret is adequate.

25       Defendant also argues that the complaint contains insufficient allegations with respect to

26   Defendant's alleged "misappropriation" of Plaintiff's trade secrets.  The complaint states the

27   following: (1) that Defendant was bound by confidentiality requirements and contractual

28   provisions granting exclusive ownership rights in the DataPlace source code to Plaintiff; (2) that

12

1    Defendant "began developing a nearly identical product for itself called Pushpin . . . [,] the work

2    for [which] began in early 2007, even while Placebase was continuing to develop the DataPlace

3    project," Complaint ¶ 32; (3) that Defendant "used the same programmers to develop Pushpin

4    and PolicyMap that it used to develop DataPlace," *id*.; (4) that Defendant's new product was

5    "substantially similar to DataPlace with substantially similar functionality," Complaint ¶ 36; and

6    (5) that Defendant developed its product in so much less time, at such an inferior cost, and with

7    so many fewer resources that Defendant could only have "copied, incorporated, and prepared

8    derivative works of KnowledgePlex's" confidential code, *id*.  *See generally* Complaint ¶¶ 15-21,

9    31-37.  Given that Plaintiff has not yet had the benefit of discovery, and in light of the liberal

10   pleading standard of Rule 8(a), the Court concludes that Plaintiff adequately has alleged

11   misappropriation of a trade secret.

12   **C.    Dismissal of copyright claim pursuant to Rule 12(b)(1)**

13           To demonstrate infringement of a copyrighted computer code, Plaintiff has the burden of

14   showing (1) that it owns a valid copyright in the code it alleges to have been copied, and (2) that

15   Defendant copied "constituent, original elements" of that code."  *Data Gen. Corp. v. Grumman*

16   *Systems Support Corp.*, 36 F.3d 1147, 1160 & n.19 (1st Cir. 1994); *see also* 17 U.S.C. § 501;

17   *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Defendant argues that the

18   Court lacks subject matter jurisdiction over at least part of Plaintiff's copyright infringement

19   claim because the deposits underlying the copyright registrations are defective.  Certificates of

20   copyright registration are issued by the Copyright Office after it accepts a registrant's application,

21   fee, and deposit of a representative copy of the work.  17 U.S.C. § 408.  Registration deposits of

22   computer code generally require "one copy of identifying portions of the program," the precise

23   form of which depends upon whether the program contains trade secrets, whether it is more than

24   fifty pages in length, and whether it is a "revision" or an original work.  37 C.F.R. §

25   202.20(c)(vii).

26           "A key purpose of . . . the deposit requirement is to prevent confusion about which work

27   the author is attempting to register."  *Data Gen. Corp.*, 36 F. 3d at 1162.  To further this purpose,

28   all that is required is enough "of the source code . . . [to] 'reveal[] an appreciable amount of

13

1   *original* computer code.'" *Id*. (quoting 37 C.F.R. § 202.20(c)(2)(vii)(A)(2)) (amendments and

2   emphasis in original).  Consequently, while a valid registration "is a prerequisite to suit under the

3   Copyright Act," *id*. at 1160, and its absence may be a "jurisdictional" defect, *see, e.g.*, *Perfect 10,*

4   *Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 710 n.1 (9th Cir. 2007), the Ninth Circuit has held that

5   the standard governing the sufficiency of copyright deposits for purposes of maintaining an

6   infringement suit is "broad and deferential."  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477,

7   486 (9th Cir. 2000).  Thus, "absent intent to defraud and prejudice, inaccuracies in copyright

8   registrations do not bar actions for infringement."  *Id*. (quoting *Harris v. Emus Records Corp.*,

9   734 F.2d 1329, 1335 (9th Cir. 1984)); *see also Urantia Found. v. Maaherra*, 114 F.3d 955, 963

10  (9th Cir. 1997) (noting "overwhelming" endorsement of the *Harris* standard in the case law).

11         In the instant case, Defendant does not claim that Plaintiff committed fraud on the

12  copyright office in registering the relevant copyrights.  Instead, Defendant argues that Plaintiff's

13  failure to provide the first twenty-five pages of the relevant computer code renders its deposit

14  copy defective.[5]  Defendant contends that the magnitude of Plaintiff's deposit errors prevents the

15  Court from excusing them.  The applicable rule, however, contains no such exception.  Indeed, as

16  the First Circuit has noted, the Ninth Circuit's rule is particularly generous towards plaintiffs in

17  this regard, requiring "that a defendant . . . show that it was *prejudiced* by a fraudulent

18  misstatement or omission in a registration application . . . , whereas other[] [courts] merely

19  require proof that an intentional error, if discovered by the Copyright Office, would have been

20  *material* to the registration decision."  *Data Gen. Corp.*, 36 F. 3d at 1161 n.24 (citing *Harris*, 734

21  F.3d at 1335 (emphasis in original)).[6]  Defendant has not explained how it was prejudiced by

22  Plaintiff's purported deposit errors, and it is difficult to see how Defendant could make such a

23  showing.  The deposit requirements are designed to aid the Copyright Office in its record-

24  ─────────────────

25         [5] Defendant points out that the Copyright Office itself determined that Plaintiff's deposit
    did not comply with applicable requirements.

26
27         [6] To the extent that *Geoscan, Inc. of Texas v. Geotrace Technologies., Inc.*, 226 F.3d 387,
    393 (5th Cir. 2000) held that only absolute compliance with the "statutory formalities" is
    sufficient to confer jurisdiction pursuant to 17 U.S.C. § 411, that holding is in direct conflict with

28  the Ninth Circuit's more forgiving rule.

                                        14

keeping duties.  *Id*. at 1162.  By contrast, "giv[ing] would-be infringers notice of the extent of their civil liability . . . . can hardly have been an important legislative goal because a copyright owner is free to register any time before filing suit, even *after* the act of infringement."  *Id*. at 1162 n.26.

Finally, to the extent that Defendant argues that the *scope* of the Court's subject matter jurisdiction is limited to allegations based on portions of the DataPlace source code properly deposited with the Copyright Office, Defendant provides no authority for such a parsing of the Ninth Circuit's rule, and the Court has found none.  Indeed, the Ninth Circuit in *Three Boys* explicitly rejected an argument that the district court lacked subject matter jurisdiction over a copyright infringement claim where the plaintiff had "failed to register a complete copy of the song upon which the lawsuit was based," in that "the deposit copy d[id] not include the majority of the musical elements that were part of the infringement claim."  *See Three Boys Music Corp.*, 212 F.3d at 486.  The Court reiterated that the standard with respect to the adequacy of deposits is "broad and deferential."  *Id*.  Accordingly, Plaintiff's incomplete deposit in the instant case does not deprive the Court of subject matter jurisdiction over the DataPlace code.[7]

### III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss will be denied.  In addition, Plaintiff is ordered to join Vinq as a party to this action pursuant to Federal Rule of Civil Procedure 19(a).

**IT IS SO ORDERED.**

---

[7] Defendant's argument with respect to the deposit is best directed towards the first required element of a copyright infringement claim on the merits: the possession of a "valid" copyright.  *See, e.g.*, *Shady Records, Inc. v. Source Enters., Inc.*, No. 03 Civ. 9944(GEL), 2005 WL 14920, at *8 (S.D.N.Y. Jan. 3, 2005) (rejecting argument that court lacked subject matter jurisdiction due to incomplete deposits and noting that such an argument "is routinely adjudicated by the factfinder as potentially negating the first element of a copyright infringement suit, not as a jurisdictional issue to be decided by the Court").

1   DATED: 12/17/08

2

3                                      _____
                                       JEREMY FOGEL
4                                      United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

1   This Order has been served electronically upon the following persons:

2   Caroline McIntyre cmcintyre@be-law.com, swalker@be-law.com

3   David J. Moorhead david.moorhead@dbr.com, iplitigation@dbr.com

4   Donald P. Gagliardi dgagliardi@be-law.com, emtofelogo@be-law.com

5   Kenneth W. Brothers , Esq BrothersK@dicksteinshapiro.com,
6   mccandlessd@dicksteinshapiro.com

7   Richard W. Young richard.young@dbr.com, iplitigation@dbr.com

8   S. Fey Epling sfepling@dbr.com, ivan.mendoza@dbr.com, michelle.sankey@dbr.com

9   Steven Michael Selna steven.selna@dbr.com, gloria.cadena@dbr.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 08-4267 JF (RS)
ORDER DENYING MOTION TO DISMISS
(JFLC3)